IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

BRENNAN CENTER FOR JUSTICE
AT THE NEW YORK UNIVERSITY SCHOOL OF LAW,

      Plaintiff,

v.

UNITED STATES DEPARTMENT OF HOMELAND
SECURITY, UNITED STATES CUSTOMS AND
BORDER PROTECTION, and UNITED STATES
IMMIGRATION AND CUSTOMS ENFORCEMENT,

      Defendants.

No. 1:20-cv-00427

_____

## COMPLAINT

Plaintiff Brennan Center for Justice at the New York University School of Law (the "Brennan Center") hereby complains as follows against Defendants the United States Department of Homeland Security ("DHS"), United States Customs and Border Protection ("CBP"), and United States Immigration and Customs Enforcement ("ICE"):

### INTRODUCTION

1.      This is an action for the production of public records and injunctive relief pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

2.      On November 5, 2018, the Brennan Center sent separate and substantively identical FOIA requests to Defendants DHS and ICE seeking records related to the Data Analysis System ("DAS") in use by ICE and contributed to by DHS and at least two of its agency components (the "DAS Requests").

3.      Also on November 5, 2018, the Brennan Center sent separate and substantively identical FOIA requests to Defendants DHS, ICE, and CBP seeking records named and described in a Request for Records Disposition Authority submitted by ICE to the National Archives and Records Administration ("NARA") in January 2017 (the "NARA Requests" and, together with the DAS Requests, "the FOIA Requests").

4.      The Brennan Center sought expedited processing for each and every one of these FOIA record requests under 6 C.F.R. §§ 5.5(e)(1)(ii) and (iii) and requested fee waivers under 6 C.F.R. §§ 5.11(d) and (k).

5.      To date, none of the Defendants has released any records responsive to the DAS Requests or the NARA Requests.

6.      Plaintiff has exhausted its administrative remedies to enforce the FOIA Requests and seeks relief from this Court as a last resort to obtain information that should be publicly available.

## PARTIES

7.      Plaintiff the Brennan Center, a 501(c)(3) organization, regularly publishes reports on a wide range of U.S. policy issues, including counterterrorism and security.  The Brennan Center has released over 40 publications in the form of reports in the last four years.  As such, the Brennan Center meets the definition of an organization that is "primarily engaged in disseminating information" under 5 U.S.C. § 552(a)(6)(E) and 28 C.F.R. § 16.5(e)(1)(ii).  Recently, the Brennan Center has published a report, several fact sheets, and multiple articles on the intersection of national security and immigration policy.[1]

---

[1] *See, e.g.*, *Social Media Surveillance by Homeland Security Investigations: A Threat to Immigrant Communities and Free Expression, Brennan Ctr. for Justice (2019), https://www.brennancenter.org/our-work/research-reports/social-media-surveillance-homeland-*

8. The Brennan Center regularly writes and publishes reports and newspaper articles and appears on various media outlets, addressing U.S. policy on issues ranging from counterterrorism efforts to voting rights to campaign finance laws and beyond, and it will continue to do so for the foreseeable future.

9. Defendant DHS is an "agency" within the meaning of 5 U.S.C. § 552(f).

10. Defendants CBP and ICE are components of DHS and thus similarly qualify under the meaning of 5 U.S.C. § 552(f).

11. DHS, CBP, and/or ICE have possession and control over some or all of the requested records.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331.

13. Venue is appropriate in this District under 5 U.S.C. § 552(a)(4)(B).

---

*security-investigations-threat*; Raya Koreh, *Border Agents' Secret Facebook Group Highlights Social Media Vetting Risks for Immigrants*, Brennan Ctr. for Justice (2019), https://www.brennancenter.org/our-work/analysis-opinion/border-agents-secret-facebook-group-highlights-social-media-vetting-risks; Faiza Patel, *Stop Collecting Immigrants' Social Media Data*, Brennan Ctr. for Justice (2019), https://www.brennancenter.org/our-work/analysis-opinion/stop-collecting-immigrants-social-media-data; Tim Lau, *Flawed Terrorism Report Shows Administration's Skewed Priorities*, Brennan Ctr. for Justice (2019), https://www.brennancenter.org/our-work/analysis-opinion/flawed-terrorism-report-shows-administrations-skewed-priorities; Rachel Levinson-Waldman, *How ICE and Other DHS Agencies Mine Social Media in the Name of National Security*, Brennan Ctr. for Justice (2019), https://www.brennancenter.org/our-work/analysis-opinion/how-ice-and-other-dhs-agencies-mine-social-media-name-national-security; Harsha Panduranga, *Social Media Vetting of Visa Applicants Violates the First Amendment*, Brennan Ctr. for Justice (2019), https://www.brennancenter.org/our-work/analysis-opinion/social-media-vetting-visa-applicants-violates-first-amendment; Faiza Patel et al., *Social Media Monitoring*, Brennan Ctr. for Justice (2019), https://www.brennancenter.org/our-work/research-reports/social-media-monitoring.

## BACKGROUND

14.    Based on publicly available information, DHS and its components appear to dedicate considerable time and resources to expanding data collection initiatives.  Although DHS releases compliance documents like Privacy Impact Assessments ("PIA") and Systems of Records Notices that refer to such initiatives, the publicly available documents do not provide a comprehensive understanding of DHS's data collection and privacy policies.  There is little transparency about DHS's collection and use of personal information, DHS's rules on the sharing and disclosure of such information, and DHS's process for ensuring compliance with privacy guidelines.

15.    Records responsive to the FOIA Requests would provide the public the details necessary to evaluate the lawfulness and effectiveness of DHS's information collection practices, including its recent attempts to automate social media vetting—an issue with potentially significant consequences for Americans' privacy.[2]

### The Data Analysis System ("DAS") Records

16.    According to DHS's September 29, 2017 PIA,[3] DAS is an analytical database that collects personally identifiable information ("PII") and is maintained by Enforcement and Removal Operations, a subcomponent of ICE.[4]  Within Enforcement and Removal Operations, the

---

[2] *See* Office of Inspector Gen., Dep't of Homeland Sec., *DHS' Pilots for Social Media Screening Need Increased Rigor to Ensure Scalability and Long-Term Success*, OIG-17-40 (Feb. 27, 2017), https://web.archive.org/web/20170311201529/https://www.oig.dhs.gov/assets/Mgmt/2017/OIG-17-40-Feb17.pdf; Jake Laperruque, *ICE Backs Down on "Extreme Vetting" Automated Social Media Scanning*, Project on Gov't Oversight (May 23, 2018), http://www.pogo.org/blog/2018/05/ice-backs-down-on-extreme-vetting-automated-social-media-scanning.html.

[3] Dep't of Homeland Sec., DHS/ICE DAS/PIA-048, Privacy Impact Assessment for the Data Analysis System (DAS) (Sept. 29, 2017), https://www.dhs.gov/sites/default/files/publications/privacy-pia-ice-das-september2017.pdf.

[4] *Id.* at 1.

4

National Criminal Analytics and Targeting Center uses DAS to assist "field offices in locating aliens convicted of criminal offenses and other aliens who are amenable to removal."[5]

17.     DAS generates leads known as "Information Referrals" by taking information that contains PII, including biographical information, immigration and criminal history, custody data, naturalization information, and vehicle and insurance information, from DHS and non-DHS sources.[6]

18.     According to the September 29, 2017 PIA, the DHS sources used by DAS include ICE's Enforcement Integrated Database, the Computer Linked Application Information Management System 3 utilized by DHS component U.S. Citizenship and Immigration Services ("USCIS"), and USCIS's Central Index System, among other DHS systems.[7] The non-DHS sources used by DAS include the Federal Bureau of Prisons' SENTRY System, the Federal Bureau of Investigation's Interstate Identification Index, and the California Department of Corrections and Rehabilitation's Strategic Offender Management System.[8] In addition, the September 29, 2017 PIA references "two commercial sources" used by DAS: (i) the United States Post Office and (ii) an unnamed commercial source.[9]

19.     Based on the September 29, 2017 PIA, it appears that DAS may be collecting and analyzing American citizens' PII without providing adequate privacy protections. The September 29, 2017 PIA notes that although data within DAS is "primarily about aliens … information about

---

[5] *Id.*

[6] *Id.* at 2. According to the DHS Privacy Impact Assessment, the National Criminal Analysis and Targeting Center also uses "other technical and knowledge-based capabilities" to generate Information Referrals, but the PIA does not identify those capabilities. *Id.* at 1.

[7] *Id.*

[8] *Id.*

[9] *Id.* at 8-9.

U.S. citizens may be included in some datasets."[10]  The September 29, 2017 PIA further notes that DAS uses datasets that "*will* include information on U.S. citizens."[11]  The PIA does *not* explain, however, whether policies exist to protect the data of American citizens that is housed in federal databases. It simply concludes that "privacy risks are sufficiently mitigated" because DAS only has a three-year retention period for the datasets.[12]

20.     Alarmingly, this data, including the PII of American citizens, may be shared with other DHS components and with "certain federal and international government agencies for the purpose of safeguarding national security."[13]  The September 29, 2017 PIA does not explain what circumstances would require safeguarding a national security interest and would justify disseminating PII, or if any objective relevant standard for determining what qualifies as a national security interest exists whatsoever.

21.     Perhaps even more concerning to the public, the September 29, 2017 PIA points out that DHS may disseminate PII of American citizens to private, undisclosed third parties. Specifically, ICE "discloses limited identifying information to a single contracted commercial data vendor on a routine basis" so that the vendor may conduct searches and return information to the National Criminal Analytics and Targeting Center.[14]  The National Criminal Analytics and Targeting Center also "provides alien names and dates of birth" to the unnamed commercial data vendor on a weekly basis.[15]  The commercial data vendor then conducts searches within its systems

---

[10] *Id.* at 2.
[11] *Id.* at 2, 15 (emphasis added).
[12] *Id.* at 15.
[13] *Id.*
[14] *Id.*
[15] *Id.* at 9, 14-15.

using public sources to "identify and provide updated information" about the aliens, and returns the results to the National Criminal Analytics and Targeting Center.[16]

22.     DHS states that "the vendor's use of the data is limited by the terms of the contract and subject to ICE security standards for the use and handling of sensitive PII."[17]  But the contract and these standards are not publicly available.  Furthermore, although DHS denies that DAS uses "technology that conducts electronic searches, queries, or analyses to identify a predictive pattern or anomaly,"[18] DHS does *not* indicate whether the project otherwise uses this technology when conducting its searches and providing results.

23.     The use of commercial vendors, external data sources, and private proprietary systems puts American citizens' data at risk.  Enforcement of immigration laws should not come at the expense of infringing on Americans' privacy rights.  The public should be informed about the data uploaded to DAS, the sources and inputs used to inform DAS's immigration recommendations, and the procedures for handling the PII used by this system.

24.     On November 5, 2018, the Brennan Center served the DAS Requests on DHS and ICE in order to bring these issues to light.

25.     The DAS Request sought the following records:[19]

    a.  All memoranda, policies, procedures, guidance, guidelines, training modules, and directives that reference DAS or that apply to the use or functioning of DAS.

    b.  Documents sufficient to identify the "Commercial Vendor" referenced in Section 2.3 of the September 2017 Privacy Impact Assessment (DHS/ICE DAS/PIA-048).

    c.  All records that constitute or contain agreements with outside agencies, private companies, and/or their respective employees about DAS, including, but not limited to, memoranda of understanding, statements of work, and purchase orders.

---

[16] *Id.*
[17] *Id.* at 15.
[18] *Id.* at 11.
[19] True and correct copies of the DAS Requests are attached hereto as Exhibit A.

d. All communications (including email correspondence) with outside agencies, private companies and/or their respective employees about DAS.

e. All memoranda, policies, procedures, guidance, guidelines, training modules, and directives that apply to the datasets or data inputs used by the DAS or related systems, and that apply to the generation and use of "Information Referrals" as defined in the September 2017 Privacy Impact Assessment (DHS/ICE DAS/PIA-048).

f. All records that constitute or contain ICE's security and privacy standards for using PII.[20]

g. All records that contain or constitute the results of testing or evaluations of DAS or the tools used by non-DHS entities, including, but not limited to, commercial vendors.

26. The Brennan Center intends to share with the public any information obtained from the DAS Requests.

**The National Archive and Records Administration ("NARA") Records**

27. In January 2017, ICE submitted a request to NARA for records disposition authority for eleven categories of records ("NARA Submission").[21] The NARA Submission named and described the use, retention period, and disposition status of these records, but the records themselves were not made public.

28. Specifically, the NARA Submission named the following categories of records maintained by DHS and its components, including those relating to DHS policies on individuals' privacy rights and the collection, tracking, and analysis of individuals' social media use: (1) Privacy Complaint Files; (2) Compliance Review Files; (3) Disclosure Advice Records; (4)

---

[20] This request includes drafts utilized for policy guidance so that they become the "working law" of the agency.

[21] Nat'l Archives and Records Administration, DAA-0567-2016-0002, Request for Records Disposition Authority (PDF created on Jan. 4, 2017), https://www.archives.gov/files/records-mgmt/rcs/schedules/departments/department-of-homeland-security/rg-0567/daa-0567-2016-0002_sf115.pdf.

Rulemaking Files; (5) Requests for System Waivers and Exceptions; (6) Information Sharing Agreement Files; (7) Testing Questionnaire Files; (8) Investment Reviews; (9) Social Medial Operational Use Template; (10) Data Access Request Analysis; and (11) Overdue A-File FOIA Request Report.[22]

29.     The NARA Submission related to ICE's Information Management Compliance Records, including ICE policies on conduction of the Privacy Act.  Ten of the categories set forth in the NARA Submission appear to include records critical to the enforcement of Defendants' data collection and privacy policies.[23]   One of these categories—Social Medial Operational Use Template ("SMOUT")—governs the collection and use of social media data and appears to be used by several DHS components, including CBP.[24]

30.     As a result, through the NARA Requests, the Brennan Center sought the release of documents pertaining to DHS's data collection and privacy policies.

31.     On November 5, 2018, Plaintiff sent substantively identical FOIA requests to DHS, ICE, and CBP for the following records related to the NARA Submission:[25]

   a.  All records created since January 1, 2015 that contain or constitute "Privacy Complaint Files" as referenced in the NARA Submission (DAA-0567-2016-0002) dated January 4, 2017.

   b.  All records created since January 1, 2015 that contain or constitute "Compliance Review Files" as referenced in the NARA Submission (DAA-0567-2016-0002) dated January 4, 2017.

---

[22] *Id.*

[23] *Id.*  Plaintiffs did not request records in the eleventh category, Overdue A-File FOIA Request Report, except to the extent that they related to the first ten categories.

[24] *Id.* at 7; *see also* CBP Smout: https://www.brennancenter.org/sites/default/files/analysis/FOIA-CBP%20Social%20Media%20Use%20Template.pdf#page=3; Customs and Border Protection, *DHS Operational Use of Social Media*, July 24, 2012, https://www.brennancenter.org/sites/default/files/analysis/FOIA-CBP%20Social%20Media%20Use%20Template.pdf.

[25] True and correct copies of the NARA Requests are attached hereto as Exhibit B.

c.  All records created since January 1, 2015 that contain or constitute "Disclosure Advice Records" as referenced in the NARA Submission (DAA-0567-2016-0002) dated January 4, 2017.

d.  All records created since January 1, 2015 that contain or constitute "Rulemaking Files" as referenced in the NARA Submission (DAA-0567-2016-0002) dated January 4, 2017.

e.  All records created since January 1, 2015 that contain or constitute "Requests for System Waivers and Exceptions" as referenced in the NARA Submission (DAA-0567-2016-0002) dated January 4, 2017.

f.  All records created since January 1, 2015 that contain or constitute "Information Sharing Agreement Files" as referenced in the NARA Submission (DAA-0567-2016-0002) dated January 4, 2017.

g.  All records created since January 1, 2015 that contain or constitute "Testing Questionnaire Files" as referenced in the NARA Submission (DAA-0567-2016-0002) dated January 4, 2017.

h.  All records created since January 1, 2015 that contain or constitute "Investment Reviews" as referenced in the NARA Submission (DAA-0567-2016-0002) dated January 4, 2017.

i.  All records, including but not limited to, memoranda, policies, procedures, guidance, guidelines, training modules, and directives, that constitute or apply to the use of Social Media Operational Use Templates, SMOUT, or Templates used by DHS, including by components CBP, ICE, or USCIS.

j.  All records that contain, constitute, or reference "Rules of Behavior" submitted pursuant to a SMOUT used by CBP, ICE, or USCIS.

k.  All versions, including draft versions, of the SMOUT or Template from July 24, 2012 through November 2, 2018.

l.  All versions, including draft versions, of the DHS Management Directive 110-01, Privacy Policy for Operational Use of Social Media.

m.  All records created since January 1, 2015 that contain or constitute "Data Access Request Analysis" or "DARA" as referenced in the NARA Submission (DAA-0567-2016-0002) dated January 4, 2017.

32.     The Brennan Center intends to share with the public any information obtained from the NARA Requests.

## AGENCY RESPONSES

### Defendant DHS

33.     On June 17, 2019, DHS informed Plaintiff by letter that DHS had referred the DAS

Requests and the NARA Requests to the ICE FOIA Office (the "DHS Responses"). In these

letters, DHS assigned the DAS request tracking number 2019-HQFO-00825 and the NARA

request tracking number 2019-HQFO-00826. Emails transmitting the letters from the DHS

Privacy Office to counsel for Plaintiff stated that the transfers to ICE would be DHS's final

responses to Plaintiff's requests.

### Defendant ICE

34.     ICE did not send any written acknowledgement of the DAS Requests or the NARA

Requests. Thus, the Brennan Center does not have relevant tracking numbers.

35.     Nonetheless, a FOIA officer from ICE contacted counsel for Plaintiff in December

2018. Plaintiff then spoke with the ICE FOIA officer on the phone ostensibly to reasonably narrow

the ICE requests, with the understanding that responses from ICE would be forthcoming.

Unfortunately, ICE has failed to respond in any fashion, or to continue discussions to narrow the

request, despite subsequent attempts by Plaintiff to contact the ICE FOIA officer.

36.     On July 2, 2019, ICE sent two emails to Plaintiff regarding the two transferred DHS

requests, referenced above. These emails assigned new tracking numbers of 2019-ICFO-44618

for the ICE DAS Request and 2019-ICFO-44628 for the ICE NARA Request. In both emails, the

ICE FOIA officer stated that ICE had determined that the requests were too broad in scope, did

not specifically identify the records sought, or only posed questions to the agency. The emails

asked Plaintiff to resubmit its request "containing a reasonable description of the records" sought.

37.     The July 2, 2019 emails further stated that "[if] we do not hear from you within 30 days from the date of this letter, we will assume you are no longer interested in this FOIA request, and the case will be administratively closed.  Please be advised that this action is not a denial of your request and will not preclude you from filing other requests in the future."

38.     On July 17, 2019, within the 30-day deadline set forth in ICE's July 2, 2019 emails, Plaintiff sent an email to the ICE FOIA Office asking to discuss clarifications to the DAS and NARA FOIA requests originally sent to DHS.  In addition, Plaintiff stated its understanding that the July 2, 2019 ICE Responses related only to the transferred DHS requests and did not relate to the requests originally set to ICE.

39.     ICE did not respond to Plaintiff's July 17, 2019 email and has not provided any documents responsive to the original ICE FOIA requests or to the transferred DHS FOIA requests.

40.     On October 15, 2019, Plaintiff submitted a Point of Contact Change notice to the ICE FOIA office in regards to 2019-ICFO-44618 and 2019-ICFO-44628.

41.     On October 18, 2019, the ICE FOIA Office responded to the Point of Contact Change notice by email, stating that ICE had administratively closed 2019-ICFO-44618 and 2019-ICFO-44628 because ICE claimed that it did not receive the clarification it needed to proceed with the requests.  ICE's email did not acknowledge Plaintiff's July 17, 2019 email asking to discuss clarifications to the FOIA requests.

### Defendant CBP

42.     On December 4, 2018, CBP sent Plaintiff an email issuing tracking number CBP-2019-015055 for the CBP NARA Request.

43.     On July 22, 2019, CBP sent Plaintiff an email changing the tracking number for the CBP NARA Request to CBP-OT-2019-015055.

44.     CBP has not made any further response to Plaintiff's NARA Request and has not provided any responsive documents.

## ADMINISTRATIVE APPEALS

45.     On October 15, 2019, the Brennan Center sent administrative appeals to DHS and ICE requesting that the DHS Responses and the ICE Responses be reversed and that all documents within the scope of the DAS Requests and NARA Requests be disclosed.

46.     Pursuant to 6 C.F.R. § 5.8(a)(1), these administrative appeals were timely submitted within 90 working days of the DHS Responses and the ICE Responses.

47.     Specifically, in the DAS administrative appeal, the Brennan Center appealed (1) DHS's failure to complete an adequate search of its own records to determine whether it maintains responsive records prior to transferring the FOIA request to the ICE FOIA Office, (2) ICE's failure to establish an adequate basis for the nondisclosure of responsive documents, and (3) ICE's failure to establish the adequacy of its search.

48.     Similarly, in the NARA Request administrative appeal, the Brennan Center appealed (1) DHS's failure to complete an adequate search of its own records to determine whether it maintains responsive records prior to transferring the FOIA request to the ICE FOIA Office, (2) ICE's failure to establish an adequate basis for the nondisclosure of responsive documents, and (3) ICE's failure to establish the adequacy of its search.

49.     Neither ICE nor DHS responded to the administrative appeals within the 20 working day statutory deadline.  5 U.S.C. § 552(a)(6)(A)(ii).

## CLAIMS FOR RELIEF

### Count I

### <u>Violation of FOIA 5 U.S.C. § 552</u>

50.     Plaintiff repeats and re-alleges the foregoing allegations as if set forth herein verbatim.

51.     Defendants failed to comply with the requisite statutory periods that govern compliance under FOIA with respect to Plaintiff's requests. 5 U.S.C. §§ 552(a)(6)(A)(i), 552(a)(6)(A)(ii).  Moreover, Defendants have shown no indication that they will substantively respond, at all, to the FOIA Requests.  Defendants have thus violated their obligations by wrongfully withholding information from Plaintiff.

52.     Plaintiff has exhausted all required administrative remedies.

53.     Plaintiff has a legal right under FOIA to obtain the information it seeks, and there is no legal basis for the denial by Defendants of said right.

### Count II

### <u>Violation of FOIA 5 U.S.C. § 552</u>

54.     Plaintiff repeats and re-alleges the foregoing allegations as if set forth herein verbatim.

55.     On information and belief, Defendants DHS and ICE have a pattern and practice of violating FOIA's timing and procedural requirements set forth in 5 U.S.C. §552(a)(6)(A), (B), and (C) in connection with the response to and processing of FOIA requests.

56.     In particular, Defendants have adopted and endorsed a pattern or practice of regularly failing or refusing to produce requested records or otherwise demonstrate that requested

records are exempt from production within the time period required by FOIA or within a reasonable period of time.

57.     Defendants carry out this policy by disregarding responsive emails from requestors, needlessly forwarding requests between agency components, administratively closing requests without cause, and failing to contact requestors within statutory deadlines in order to request or provide an explanation for the extra time needed to process the requests.

58.     Upon information and belief, the agencies' FOIA violations are not isolated instances.  This pattern is demonstrated by what are, in total, five separate FOIA Requests served by Plaintiff in 2018, none of which has generated a single substantive response or document.  In addition, Defendant DHS publicly reported that DHS's initial response time to "simple requests" exceeded 26 days and to "complex requests" in an average exceeding 97 days.[26]

59.     Defendants should not be permitted to violate their obligations under FOIA by simply delaying, failing to respond, or pushing requests within and between agencies in an effort to slow the process or wear down the patience of requesting parties like Plaintiff.

60.     The delay in responding to and processing Plaintiff's requests is not attributable to Plaintiff.  Plaintiff is being and will continue to be irreparably harmed unless Defendants are compelled to comply fully with FOIA's procedural requirements.  Because Plaintiff relies on FOIA requests from Defendants to produce and disseminate its reports on counterterrorism and national security issues, Plaintiff faces a significant likelihood of imminent future harm from Defendants' policy and practice.

---

[26] U.S. Dep't of Homeland Sec., 2018 Freedom of Information Act Report to the Attorney General of the United States and the Director of the Office of Government Information Services at ii n.3 (March 2019), https:// www.dhs.gov/sites/default/files/publications/dhs_fy2018_foia_report_updated.pdf

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff the Brennan Center prays that the Court grant the following relief:

(1)     Order Defendants to conduct a thorough search for any and all records responsive to Plaintiff's FOIA requests and demonstrate that it employed search methods reasonably calculated to uncover all records responsive to each request;

(2)     Order Defendants to promptly produce, by a date certain, all nonexempt documents or portions of documents that are responsive to the requested information, including any such items referred to other Government agencies, in their entirety and make copies promptly available to Plaintiff;

(3)     Order Defendants to promptly provide an index pursuant to *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), and its progeny, inventorying all responsive records and itemizing and justifying all withholdings of responsive documents;

(4)     Order Defendants to certify that all responsive records have either been produced or inventoried on Defendant's *Vaughn* index;

(5)     Enjoin Defendants from failing or refusing to produce all non-exempt records responsive to Plaintiff's FOIA requests or otherwise demonstrate that requested records are exempt from production within the time period required by FOIA or, in the alternative, within a reasonable period of time;

(6)     Enjoin Defendants from charging Plaintiff search, review, processing, and duplication fees in connection with responding to the Requests;

(7)     Expedite this action in every way pursuant to 28 U.S.C. § 1657(a);

(8)     Award Plaintiff reasonable costs and attorneys' fees as provided for in 5 U.S.C. §

552(a)(4)(E), 5 U.S.C. § 552a(g)(1) and/or 28 U.S.C. § 2412(d); and

(9)     Such other and further relief as the Court may deem just and proper.

This 16th day of January, 2020.

Respectfully submitted,

**EVERSHEDS SUTHERLAND (US) LLP**

/s/ Francis X. Nolan, IV
Francis X. Nolan, IV
1114 Avenue of Americas
The Grace Building, 40th Floor
New York, New York 10036
Telephone: (212) 389-5083
Facsimile: (212) 389-5099
franknolan@eversheds-sutherland.com

Andrea L. Gordon (*pro hac vice* application to be filed)
700 Sixth Street, N.W., Suite 700
Washington, D.C. 20001
Telephone:  (202) 383-0955
Facsimile: (202) 637-3593
andreagordon@eversheds-sutherland.us

*Counsel for Plaintiff The Brennan Center for Justice*
*at the New York University School of Law*